THE MORRIS AND ESSEX RAILROAD COMPANY and THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY

*v.*

THE HOBOKEN AND MANHATTAN RAILROAD COMPANY and THE NEW YORK AND JERSEY RAILROAD COMPANY.

[Argued September 20th, 1904. Decided November 19th, 1904.]

1. A tunnel company, in the course of condemnation proceedings to acquire a right of way under the property of a railway company, executed a covenant that it would not at any time thereafter institute proceedings to condemn any right or interest whatever under any lands belonging to such railroad company lying between certain boundaries where the tunnel

was located.—*Held,* that if such covenant was valid it could not be enforced in equity by an injunction restraining a successor of the tunnel company from acquiring a further right of way under such property, but the parties should be left to their remedies at law.

2. The covenant was not one running with the land, and therefore did not pass to defendant, who acquired property of the tunnel company under foreclosure of a mortgage.

3. If the covenant be treated as creating an easement, it would not entitle the. complainant to an injunction.

4. Such covenant would not preclude another corporation from condemning a right of way through the complainant's property in another ·direction, and thereby deriving benefit from a prior construction by the tunnel company, though such corporation was on friendly terms with the tunnel company and the stockholders in the tunnel company were also stockholders in the new corporation.

On motion for preliminary injunction.

*Mr. William D. Edwards* and *Mr. John W. Griggs,* for the complainants.

*Mr. Charles L. Corbin,* for the defendants.

STEVENSON, V. C. (orally.).

In the case of the Morris and Essex Railroad Company and the Delaware, Lackawanna and Western Railroad Company against the Hoboken and Manhattan Railroad Company and the New York and Jersey Railroad Company my conclusion is that no proper case is presented for an injunction. I shall endeavor, as fully as I can, to indicate to counsel the main reasons which have led me to this conclusion, reserving for a written opinion, in case of appeal, a more accurate statement, with citation of authorities. I have examined, I think, all the authorities cited by counsel and some others, although, of course, it is impossible for me to cite them, and impossible for me to refer to many of them at present.

The object of the bill is to obtain an injunction, restraining the defendant corporation, the Hoboken and Manhattan Railroad Company, from exercising the right of eminent domain for the condemnation of property belonging to the complainants along the line of the route which the defendant corporation has laid

out, and which is the route of a tunnel railroad, extending, in part, from the Pavonia ferry, in a northerly direction, parallel with the Hudson river and not very far from it, through and under the entire terminal property of the complinants, consisting of a tract of, I think, about one hundred and seventy-five acres, to a point beyond that tract and near the Hoboken ferry.

As I recall the bill, it is an injunction bill *simpliciter*. It is not a bill to restrain the defendants in the unreasonable and injurious location of their route through the property of the complainants when they might, and ought to, so locate their route as to do less injury. It is not a bill to prevent the defendants from exercising the right of eminent domain in such a manner as to prevent the complainants from pursuing their corporate business and accomplishing the purposes, largely of a public nature, for which they exist and have corporate existence. It is not a bill to restrain the defendants from using that portion of the tunnel which may be called the old tunnel, extending out from the original high-water line of the river, or rather I may say extending from what is called the shaft under the river, excepting in a manner in which the original proprietors of that tunnel would be allowed to use that particular piece of land. The bill prays for an injunction which will prohibit the main defendant corporation from exercising the right of eminent domain for the condemnation of a very large portion of their route. If the defendant corporation should be so enjoined and still wished to build a tunnel route between the two points that I have indicated, counsel for the complainants, in opening the case, states and admits that it would be necessary for this defendant corporation to construct its tunnel all the way around this large tract of land at a very much greater expense than it will cost to construct the tunnel which they have located, which is practically a direct line through the terminal property of the complainants.

Upon this application, what are merely legal objections to the action which the defendant corporation, the Hoboken and Manhattan Railroad Company, is now engaged in taking, are not to be considered. A few moments ago counsel for the complainants handed me the case, which is now before me, of *Jersey City*

v. *National Docks Railway Co.*, reported in *55 N. J. Law (26 Vr.) 194.* I have merely glanced at this case; but it seems to be a *certiorari* case, and, from what I have seen of the report of it, it appears that the principle in that case is laid down and enforced that it is a condition precedent, under the General Railroad act, to the taking of property under the right of eminent domain by a railroad company that the parties have been unable to agree. I do not exactly see with what view this case was presented to me. If, in this case, there has been no failure to agree and it follows that the defendant corporation cannot exercise the right of eminent domain under the General Railroad act, that is a complete defence which undoubtedly will be presented to the supreme court in the *certiorari* suit, which is now pending. In this court we have only to deal with the equitable claims of the complainants. The complainants in this case set up that they have an equity which can be enforced in this court and cannot be enforced in the supreme court, in which the *certiorari* suit is pending, to have an injunction, restraining the Hoboken and Manhattan Railroad Company from condemning their route through the complainants' terminal property; and that is the question with which we have to deal.

The sole origin of any such equity consists in, and arises from, a covenant that was made on January 10th, 1877, by a corporation now practically extinct, the Hudson Tunnel Railroad Company, by which that original tunnel company undertook to covenant and agree with the complainants in the terms which I shall read. As a matter of fact, on the date which I mentioned—January 10th, 1877—two covenants were made by this original tunnel company, one with the complainants and one with a land company; but, inasmuch as the complainants afterwards acquired all this land affected by this covenant from the land company, and may possibly, although I do not think the fact appears, have acquired, by assignment, all the rights of the land company growing out of the covenant made by the tunnel company with it (the land company), the covenant may be, I think, conveniently dealt with as if there were but one covenant between the Hudson Tunnel Railroad Company and the Morris and Essex and Delaware, Lackawanna and Western

railroad companies, and it be assumed that, at the time the covenant was made, the railroad companies owned all the land affected by the two covenants.

The words of the covenant, which I am about to read, come near the end of a long instrument, executed by the Hudson Tunnel Railroad Company under its seal, which appears to have been made—was made—while certain condemnation proceedings were pending in which the original tunnel company was endeavoring to acquire a right of way extending from the centre of the Hudson river in a westerly direction under the terminal property of the railroad companies to a point at Henderson street, which is at or near the westerly boundary of the whole terminal tract, a point quite remote from the river and quite remote from the line of the route of the Hoboken and Manhattan Railroad Company, as now laid out.

The main object of the agreement or covenant, because it was an instrument executed only by one party, appears on its face. It is recited that the tunnel company makes the agreement for the purpose of inducing the commissioners, who had been appointed in the condemnation proceedings, to award a less sum for the land, easement, rights and privileges which were sought to be taken than they otherwise might or would award, it being understood that the agreement was to be shown to the commissioners. A further consideration of one dollar is recited.

The provisions which come first in the agreement may be described generally as undertaking to protect the property of the railroad companies from certain injurious effects that might accrue from the construction and operation of the tunnel; and, of course, the theory was that if the tunnel company bound itself by this covenant in such a way as to properly indemnify the railroad companies against such possible injurious effects the damages to be allowed by the commissioners would be lessened.

The fifth paragraph, near the end, is as follows:

"And the said tunnel company hereby further covenants and agrees to and with the said railroad companies that the said tunnel company shall not and will not at any time hereafter institute or prosecute any suit or proceedings whatsoever to condemn or acquire for any use or purpose whatsoever any lands, or any right, title, interest or easement whatsoever,

in, to, over, or under any lands now belonging to or in the tenure of the said railroad companies, or either of them, situate in the said city, lying between Provost street on the west and the exterior line of piers on the east, or north of the centre line of Sixteenth street, and if any such proceedings shall be attempted this agreement shall be a complete bar and defence to any and every such proceeding."

I may say here that the route, extending from the river or from the shaft in a westerly direction under this terminal property, ran along what was Fifteenth street, and Sixteenth street was the next street, parallel with Fifteenth street, on the north. The similar agreement, executed at the same time with the land company, to which I referred, contained precisely this same covenant, excepting that it undertakes to exclude from the possibility of future condemnation all land belonging to the land company south of Fourteenth street and lying between Henderson street or Provost street and the exterior line of piers.

So that the result of these two covenants was to give or recognize a right of way on the part of the tunnel company from the river extending practically in a straight line westerly under the entire terminal tract to Provost street or Henderson street, and to leave that right of way shut in on both sides by land which came within one block on each side; so that, in pursuance of any existing or future legislation, if it became useful and important to the tunnel company and to the public service to extend the tunnel either north or south, such extension would be impossible without a breach of this covenant, except by making the extension from a point remote from the river, way out at Provost or Henderson street; that was the object of the covenant. It was to shut in this public right of way within these narrow limits, and the tunnel company undertook to covenant that it would not exercise the right of eminent domain under legislative sanction as it then existed or might thereafter exist so as to open a door through this barrier on the north or on the south.

The propositions of the complainants are that that obligation of the original tunnel company was not illegal, was not void; but, on the contrary, legal and valid. And of necessity they advance the further proposition, which goes a long way beyond those which I have stated, that this covenant is specifically

enforceable in equity by the instrumentality of an injunction, because an injunction in this suit is practically a decree of specific performance. The other proposition of the complainants is that the obligation of this covenant has in a lawful manner been devolved upon and now rests upon the Hoboken and Manhattan Railroad Company, which was organized under the General Railroad law in 1903. Under the old or the new General Railroad act?

Mr. Corbin—Under the new General Railroad act.

The Court—I may say that at first blush this last proposition would seem to be somewhat audacious. Here we have a corporation created under this General Railroad act of 1903, laying out its route according to law—of course, if they have not proceeded according to law they would be stopped in the *certiorari* suit; we are assuming that they are proceeding according to law—through the terminal property of the complainants, along this defined line; and the bar, which is said to be in equity an absolute bar to the exercise of the right of eminent domain for the condemnation of a large part of this route, for all of it which lies through and under and across this great terminal tract of the complainants—an absolute bar in equity—is a covenant made by this old tunnel company in the year 1877, twenty-seven years ago.

Now, as briefly as possible, I shall try to deal with those two positions. They are the main positions which the complainants take and seek to sustain.

The first question is whether this original covenant, at the time it was made, was legal and enforceable specifically in equity as between the original parties. And I may say here that it seems to be proved—I think admitted—that all the obligations of the original Hudson Tunnel Railroad Company, by virtue of certain consolidations, finally devolved upon the Hudson Tunnel Railway Company, a corporation which was created by the consolidation of the original Hudson Tunnel Railroad Company and certain other railroad tunnel company or companies. So that it makes no difference whether the inquiry is whether the original tunnel company was bound by this covenant, and bound in a court of equity, so that the covenant might be specifically en-

forced against it, or whether the Hudson Tunnel Railroad Company, the consolidated company, was bound in that way.

I have not found it necessary to express a final opinion upon the very interesting question which is thus presented at the start, whether a railroad corporation organized under the General Railroad act can, for a sufficient consideration, I may say—a valuable consideration—make a covenant which strips it of the power to condemn a particular piece of land for the purposes of its incorporation under the act; or, in other words, for the discharge of its corporate duties, which have not only a private relation, but a very important public relation, so as to subject itself to an action for damages in case of a breach. In other words, I do not undertake to decide, whatever impressions or opinion I may have, whether such a covenant can be made the basis of an action at law for damages. I think the complainants, in order to secure an injunction in this case, would be bound to establish the affirmative of that proposition. It may be that such a covenant should be deemed illegal—contrary to public policy—and having in it such an evil element that the law would not take cognizance of it at all, and would not give either party any relief growing out of the making of the covenant or of its breach. There is strong support in reason and authority for the proposition that a state cannot strip itself of the power to exercise the right of eminent domain, and when for the construction of great public highways this right is exercised, and from the nature of the case is practically exclusively exercised by delegates of the state, the reasons for leaving the principal untrammeled seem to apply to the agent as well.

It may be that the covenant should be deemed void, but that any consideration paid for it might be recovered—the parties might be restored to the original status. That is a possibility. I do not pause to discuss whether such a doctrine could be maintained or not. I am thoroughly satisfied that even if the view is taken most favorable to the complainants that an action at law would lie upon the breach of such a covenant, and the damages of the covenantee could be so recovered, still, the covenant should not be specifically enforced in equity by means of an injunction; but, on the other hand, the parties should be left to

their rights and remedies as they would be ascertained and enforced in a court of law.

I call the attention of counsel to a case which I have just happened to find that bears upon this branch of the discussion (*Beasley* v. *Texas and Pacific Railway Co., 191 U. S. 492*), a very recent decision of the supreme court of the United States. I have only had a few moments to hurriedly glance through this case. I cite it because of the very sharp distinction which Mr. Justice Holmes draws between a right in a case like this, which might be enforceable growing out of a covenant running with land—of course, a valid and legal covenant—or growing out of an easement created by a covenant, or a right in the nature of an easement, on the one hand, and the claim of the covenantee to have specific performance in equity through the instrumentality of an injunction. I do not say that the case is on all fours with the present one by any means. The case also involves, to a certain extent, the peculiar law of Louisiana, but, nevertheless, it also involves the very same law with which we have to deal. In that case—I will only endeavor to give the outlines of it—an owner of land conveyed what apparently was a most valuable right of way to a railroad company, and the instrument of conveyance, I think, contained a covenant on the part of the railway company not to establish or maintain a depot within three miles of a certain depot which the parties stipulated should be constructed and maintained upon the property.

Now, as counsel stated, and I think made plain on the argument, the decisions on this general subject are variant. Mr. Justice Holmes refers to this conflicting course of judicial decision, but he points out the possibility that the case may have presented a covenant running with the land; and also, I think, the possibility that what was done operated to create an easement, or right in the nature of an easement, appurtenant to the remaining land of the grantor who granted the right of way to the railroad company. He takes pains to avoid undertaking to decide the precise legal character of this covenant and transaction connected therewith. I think he expresses no opinion upon the various questions raised in regard to the legal rights of the respective parties. But he holds that even if—no, I will

not say that he holds—as I recall the case, he indicates the opinion that even if the covenant or other right—whatever it was—in the nature of an easement or otherwise, belonging to the owner of the plantation, is in some way enforceable in law, and against, of course, the grantee of the original railroad company—for the grantee is the party in the suit—still equity would not interfere with the performance of the public duties of the railroad company in the erection of new depots by specifically enforcing this alleged right by means of an injunction. Perhaps I may have overstated or misstated in some degree the opinion expressed by Mr. Justice Holmes. I cite the case because in it the learned justice so sharply points out the distinction which I have undertaken to draw in this case between a decision of the legal rights of the parties growing out of this covenant and the decision of the simple question whether, apart from those legal rights—conceded that they exist—a court of equity will specifically enforce the right by means of an injunction.

Why, it is perfectly plain that if the original tunnel company had, under existing legislation in 1877, or in pursuance of future legislation, adjudged that the convenience of the public required a branch tunnel line from near the line of the river south to Pavonia ferry, or north to the Hoboken ferry, they would have been confronted by this covenant. They could not possibly have given the public the benefit of such branch tunnels without violating their covenant. It may be that the law ultimately will hold that if they make that kind of a covenant they must pay the damages, but that is a very different thing from holding that when they adjudicate that, notwithstanding their improvident covenant, the public interests, as well as their own interests, require an extension laterally of their tunnel, they must be barred, and the public must be barred, forever because of this covenant.

It was urged on behalf of the complainants, with very great force, that even if a covenant like this may not in all cases be specifically enforced by a court of equity through an injunction, that nevertheless there was nothing about it that was, *per se,* opposed to public policy; or, in other words, a court of equity

could not say that the public would be harmed by the observance
—the enforced observance—of this covenant on the part of the
railroad corporation, acting under the powers of the General
Railroad act. The argument was that unless it could be shown
affirmatively that the public interests in fact required the exer-
cise of the right of eminent domain in contravention of the cove-
nant, that then an injunction should go to enforce the covenant,
because nothing but a private right was in any way involved.  In
support of that contention, the case of *Union Pacific Railroad
Co.* v. *Rock Island Railroad Co., 163 U. S. 564,* was cited, and
it was claimed that the decision of the supreme court of the
United States in that case very much modified the doctrine laid
down in the prior cases. I cannot discuss this case at length.
It was decided by a divided court, a very vigorous dissent being
expressed by Mr. Justice Shiras. It presented, very briefly, this
sort of a case: The Union Pacific railroad had not undertaken to
make a lease giving exclusive possession of a portion of its route
to the Rock Island road. It had undertaken to allow the Rock
Island road, for a very long period of time, to use its tracks—
given it trackage rights; the right to use for a short distance the
tracks, the rails and facilities of the Union Pacific road for the
transportation of trains. Now, as I understand the decision, the
real gist of it is that there is nothing in such an arrangement
which is *per se* necessarily hostile to or inconsistent with the
performance of the public duties of the lessor company. It is a
most important matter to be observed that what the Rock Island
road undertook to do with these tracks was the performance of a
great public duty, precisely similar to that of the lessor com-
pany. The Rock Island company was not a party who under-
took by lease to acquire a portion of the railroad facilities of the
Union Pacific railroad, which were of a public nature, and divert
them to some private business of the lessee company in which
the public had no share and no interest. The devotion of all
this property to the great work of transportation for the public
benefit was not interfered with by this arrangement that these
two corporations made. It is not surprising that the supreme
court of the United States paused before they supported the
claim of the lessor company that their own act in making this

arrangement with the other great public corporation was void as against public policy. Such a decision as that, it seems to me, would play havoc with scores of most important arrangements that all our transportation companies are making from year to year, and which are of the utmost importance to the public welfare. All the railroads centre at certain points. We are now only a short distance from what may be called a great ganglion, where numerous railroads come to a point—a focal point—and get access to a ferry, and are brought in contact with the shipping of the New York harbor. It would be a disastrous thing if a corporation like the Pennsylvania Railroad Company could not make an arrangement giving terminal facilities, the use of its railroad terminal, to another railroad corporation without meeting this objection that it was permanently parting with the property which was necessary for it to discharge its public duties. That is a very different sort of a case from this.

I doubt very much whether a court of equity—yes, I will say I am of opinion that a court of equity ought not, in the situation that we are now considering, to obtrude itself into the affairs of a great corporation, organized under the General Railroad act, and displace the board of directors and adjudicate whether or not the public interests—the proper service of the public— would or would not be promoted by the establishment of a branch line, the erection of a station and the acquisition of property for that purpose, or by the widening of the main stem. These are things which the directors of the *quasi*-public corporation, in the discharge of their important duties, not only to the corporation, but to the public, are bound to meet and decide. A court of equity ought not to be thrust into their seats and, for instance, in this case, determine whether the public interests in fact do call for the construction of a branch line, under legislation permitting such action, from, for instance, the shaft, in a southerly direction, to the Pavonia ferry, or, in a northerly direction, to the Hoboken ferry. A court of equity cannot go into railroad business like that and usurp the functions which are vested by law in these directors.

My conclusion on this branch of the case, therefore, is that,

without undertaking to determine the many very interesting and novel questions in regard to the legal status of this sort of a covenant, the rights, the possible easements which it may create —I say my conclusion is that no right can be founded upon such a covenant to an injunction from a court of equity restraining the railroad corporation from exercising the right of eminent domain for the purposes of its incorporation, the carrying out of its great objects, many of which are of a public nature.

I think, if that conclusion is sound, we have an end of the complainants' case. And I may say here I do not pause to consider the effect of the agreement of 1903, which it was urged on behalf of the defendants amounted to a release from the railroad companies of all benefit from this covenant made in 1877.

The next question is—assuming that the conclusion that I have stated is erroneous, and all these old tunnel companies, for instance, the Hudson Tunnel Railway Company, was liable by virtue of this covenant to an injunction in this court restraining it from condemning any of the property described in the covenant—has any such obligation passed over and devolved upon the Hoboken and Manhattan Railroad Company. I leave out of view the New York and Jersey Railroad Company. They are joined as co-defendants upon the theory that they are promoting this action on the part of the Hoboken and Manhattan Railroad Company of which the complainants complain; that they are the real principals and are back of the Hoboken company in this matter. Counsel for the complainants, I think, failed to point out any adequate theory upon which it may be held that the obligation of this covenant ever went beyond the Hudson Tunnel Railway Company. In fact, counsel for complainants hardly discussed that very important question. I think the view expressed by counsel for the defendants, and set forth very fully in his brief, is the correct view—that that covenant contained in the instrument of January 10th, 1877, was not a covenant that ran with the land, so as to be imposed upon not only the tunnel company which made the covenant, but also every successive owner of the tunnel property deriving title from the original tunnel company. The general rule is stated and explained at great length in the case of *National*

*Bank of Dover* v. *Segur, 39 N. J. Law (10 Vr.) 173,* cited by counsel—the famous *Dover Case.* In that case the owner of land conveyed it and made a covenant by which he bound himself not to engage in the business of banking in Dover so as to compete with the banking business which the parties contemplated would be carried on on the land which the covenantor sold, and he expressed distinctly the intention to make that covenant available not only for the covenantee, but for any person who should take the property from him. The object of the parties was to bind the grantor so as to prevent him from competing with the banking business or corporation which the covenantee proposed to form to carry on on the property which was purchased from the covenantor. That was the object of the parties, and it is perfectly plain. Chief-Justice Beasley discussed the whole subject of covenants running with the land, and pointed out the distinction between covenants which are a benefit to the land and covenants which are a burden. In that case it was held that the covenant of Mr. Segur that he would not compete with the business which the future owners of this lot would carry on, the banking business, on the lot—that that covenant bound Mr. Segur for the benefit of the bank which afterwards became the owner of the property, and that right appertaining to that piece of land would pass from owner to owner through successive conveyances. But it was not suggested that a man could sell a lot of land in Dover and place a burden upon that land which would attach to it and be imposed upon every future owner which would prevent him from carrying on the banking business, or any other business, on that land. That is the sort of a covenant not running with the land. If it did, why all sorts of absurd and capricious burdens could be imposed upon plots of land. A man might have a grocery store on one lot and own a vacant lot next to it, and then sell the vacant lot and impose upon that lot as a burden upon all future owners an incapacity to have it applied to the grocery business, for the benefit of the lot which he retained, possibly, or for the benefit of himself personally. Such a covenant as that will not run with the land.

Now, then, in this case the effect of this covenant was, as

alleged by the complainants, to prevent the owners of the tunnel, all future owners, the then owner and all successors in title, from exercising the right of eminent domain so as to condemn certain property of the covenantee. Anybody who buys the tunnel would find himself under this most extraordinary and peculiar disqualification. I am speaking of the owner as a man; of course, the proper term to employ is one to describe a company organized under the General Railroad act. My conclusion is that the covenant did not run with the land, and, therefore, did not pass over to the New York and Jersey Tunnel Company, which acquired all this property upon the foreclosure of the mortgage made by the Hudson Tunnel Railroad Company.

There was another possible ground which, perhaps, has to be considered, although I do not understand that either party dealt with the subject—another possible ground on which it might be claimed that the obligation of this covenant practically passed over to the future owners of the tunnel. It might be claimed that, although this was not a covenant which ran with the land for the benefit of the covenantees as individuals or as corporations—as parties—it had the effect to create an easement or right in the nature of an easement appurtenant to the land which the parties sought to exempt from condemnation. There is a very great difference between these two theories. In the one case we have the future owner of the tunnel, alleged to be under a personal obligation to the covenantees, the two railroad companies—the Delaware, Lackawanna and Western Railroad Company and the Morris and Essex Railroad Company. In the other case we have the owners of the land which the Delaware, Lackawanna and Western and the Morris and Essex companies owned and which was sought to be exempted from the exercise of the right of eminent domain, protected by the covenant from the exercise of that right as against the future owners of the tunnel. Thus we have the land to the north of Sixteenth street and to the south of Fourteenth street, in some way invested with a peculiar right in the nature of an easement to be protected from condemnation proceedings instituted by any person owning the tunnel. I do not know that it is necessary to discuss this subject. I am not surprised that the elaborate and careful

discussion of the whole case by the counsel for the defendant, contained in his brief, did not include the discussion of such possible easement. There can be no authority shown, in my judgment, which will justify any such claim of easement. Such an easement is an unknown thing—the right vested in the owner of lot A by virtue of his ownership to prevent any person who becomes the owner of lot B from doing things of this character. If, however, such an easement or right in the nature of an easement belongs to the complainants as appurtenant to their land, and such easement or right is destroyed or impaired by the condemnation proceedings, it would seem that such injurious result would be a matter to be considered and allowed for in the assessment of the complainants' damages to be made in those proceedings.

I do not think, whether we deal with this covenant as a covenant running with the land, or whether we deal with the whole contract as possibly creating some easement in the adjacent lands of the covenantees, there is any basis for the claim that any obligation passed over to the New York and Jersey Tunnel Company. If that conclusion is correct, then, of course, we reach again an end of the complainants' case.

And if that conclusion is incorrect, I think the further position taken on behalf of the defendants is unassailable that there is nothing in this case which shows that the obligation which we are now assuming rested upon the New York and Jersey Tunnel Company by virtue of this covenant in any way binds the action of the defendant the Hoboken and Manhattan Railroad Company. That company stands here before this court as an independent railroad corporation, organized in 1903, under the General Railroad act. It lays out its route. It has a right to lay out its route. It lays it out, with straight lines, substantially, between these two great centres of population and traffic—these two great points where the ferries come and the railroads meet—and it has its independent capital. I believe it is shown—not disputed—that the New York and Jersey Railroad Company does not own a share of the stock of the Hoboken and Manhattan Railroad Company. Assuming that the New York and Jersey Railroad Company is owned very largely by persons who are

interested in and own the stock of the Hoboken and Manhattan Railroad Company; assuming that the relations of these companies are as intimate in all respects and just as friendly as the complainants claim, I can find no way of imposing upon this new railroad corporation the burden which now we are assuming rests upon the New York and Jersey Railroad Company. If the New York and Jersey Railroad Company found itself confronted with a situation in which it could not build a line by a certain route, I know of no reason why other persons should not come in independently and build that line, and I know of no reason why the persons interested pecuniarily as stockholders in the New York and Jersey Railroad Company should not take stock in the new corporation if they saw fit to do so. As I think I suggested to counsel in the argument, if the New York and Jersey Railroad Company should find themselves with a complete tunnel route from the city of New York, extending under the Hudson river and extending within the exterior pier line of this terminal property to a point beyond the margin of the river, the present line of the river, where there is a shaft—I say if the New York and Jersey Tunnel Company should find itself in possession of such a tunnel, built at enormous expense, and then should find that owing to its own covenant, or the covenant of prior owners of its route, or prior owners of portions of its route, it had no way of proceeding any further, so that its railroad would begin in New York City and pass under the Hudson river and end at a point thirty or forty feet underground within the terminal property of the complainant corporations, and it thus would find itself with an enormously expensive property, not worth a dollar as it then stood, and incapable of being made available by extensions which the company itself could promote and make, would there be any reason why other persons should not combine and form a railroad corporation under the General Railroad act and build another expensive tunnel from Pavonia ferry continuously up to the Hoboken ferry, intersecting this tunnel at the shaft and thus making the New York tunnel valuable, and thus availing themselves of the existence of the New York tunnel to make their property valuable? I see no reason why that should not be done, and I know of no way by which

the railroad companies, even if they had succeeded in effectually barring the progress of the New York and Jersey Tunnel Company beyond the shaft, could interfere with the operation of the new corporation in building the road or tunnel in the way that I have indicated.

I think these are the main points which were covered by the arguments of counsel, and, of course, the general conclusion which I have stated is that no injunction will be allowed in the case.